STATE OF MINNESOTA

IN SUPREME COURT

A13-0872

Court of Appeals                                                      Dietzen, J.
                                                       Dissenting, Lillehaug, J.

Thomas V. Engfer,

                          Respondent,

vs.

                                                       Filed:  September 9, 2015
                                                       Office of Appellate Courts

General Dynamics Advanced
Information Systems, Inc.,

                          Respondent,

Department of Employment and
Economic Development,

                          Appellant.
                  _____

Howard L. Bolter, Bolter Law, LLC, Edina, Minnesota, for respondent Thomas V.
Engfer.

Lee B. Nelson, Munazza Humayun, Minnesota Department of Employment and
Economic Development, Saint Paul, Minnesota, for appellant.
                  _____

S Y L L A B U S

1.      A timing provision in the Minnesota Unemployment Insurance Law, which

requires that a supplemental unemployment benefit (SUB) plan "provide supplemental

payments only for those weeks the applicant has been paid regular, extended, or

additional unemployment benefits" in order for the supplemental payments to be excluded from the definition of "wages" for purposes of determining eligibility for state unemployment benefits, Minn. Stat. § 268.035, subd. 29(a)(13) (2014), "relate[s] to" an "employee benefit plan" under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(a) (2012).

2. A SUB plan established by the employer is not maintained solely for the purpose of complying with applicable unemployment compensation laws, and therefore is not exempt from ERISA coverage under 29 U.S.C. § 1003(b)(3) (2012).

3. ERISA preempts the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), which requires that a SUB plan "provide supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits" in order for the supplemental payments to be excluded from the definition of "wages."

Affirmed.

O P I N I O N

DIETZEN, Justice.

Respondent Thomas V. Engfer ended his employment with General Dynamics Advanced Information Systems, Inc., in December 2011. Thereafter, Engfer applied for and received state unemployment benefits from appellant Department of Employment and Economic Development (DEED), and supplemental unemployment benefits through a plan offered by General Dynamics. DEED subsequently reviewed the SUB plan payments, determined that the payments counted as "wages" under Minn. Stat.

2

§ 268.035, subd. 29(a) (2014),[1] and concluded that Engfer had been overpaid state unemployment benefits. An unemployment-law judge (ULJ) affirmed DEED's overpayment determination. The court of appeals reversed, concluding that the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461 (2012), preempts a timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), which requires that a SUB plan "provide supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits" in order for the supplemental payments to be excluded from the definition of "wages." The court of appeals therefore concluded that Engfer was entitled to keep the state unemployment benefits. We affirm the decision of the court of appeals.

Thomas Engfer was laid off by his employer General Dynamics Advanced Information Systems as part of a workforce reduction. When Engfer's employment ended, he was offered the opportunity to participate in a SUB plan established by General Dynamics. The weekly SUB plan payments were intended to supplement Engfer's weekly state unemployment benefits, and when combined, equaled 100 percent of his normal weekly gross pay prior to termination. The SUB plan required Engfer to apply and be found eligible for state unemployment benefits and to contact General Dynamics' plan management firm on a weekly basis to confirm his continued eligibility for those

---

[1] In the 2014 session, the Legislature amended Minn. Stat. § 268.035, subd. 29(a)(12), and renumbered the provision as subdivision 29(a)(13). Act of May 16, 2014, ch. 251, art. 1, § 1, 2014 Minn. Laws 841, 842. The amendment does not affect the issues presented here, other than to change the numbering of the subdivision. We therefore use the current subdivision numbering for section 268.035.

benefits. According to the plan, Engfer would receive SUB plan payments, even when ineligible for state unemployment benefits, in three separate circumstances: (1) during the 1-week "waiting period" for state unemployment benefits, (2) if he had insufficient earnings for state benefits, and (3) if his state benefits expired first. The SUB plan provided 26 weeks of payments, after which Engfer would continue to receive his state unemployment benefits.

Engfer established a benefit account with DEED on December 18, 2011. He began receiving benefits under the SUB plan immediately and state unemployment benefits after the 1-week waiting period. He received $597 every week in state unemployment benefits and $2,369 every 2 weeks in SUB plan payments. The SUB plan payments continued through July 5, 2012, and ended before Engfer's eligibility for state unemployment benefits expired. Engfer received a total of $31,398 in payments from the SUB plan.

In January 2013, DEED relied upon the definition of "wages" in Minn. Stat. § 268.035, subd. 29(a), to conclude that Engfer was not eligible for state unemployment benefits during the period he was receiving supplemental payments through the SUB plan. Because the SUB plan paid benefits during weeks in which plan participants were not eligible to receive state unemployment benefits—specifically, the 1-week waiting period—DEED determined that the SUB plan payments do not qualify for the exclusion from "wages" under the Minnesota unemployment statutes. *See* Minn. Stat. § 268.035, subd. 29(a)(13) (stating that "wages" do not include "payments made to supplement unemployment benefits under a plan established by an employer" if the plan meets

4

certain conditions, including the condition that the plan provides supplemental payments only for those weeks the applicant has been paid unemployment benefits). Therefore, DEED notified Engfer that he had been overpaid $10,746 in state unemployment benefits. *See* Minn. Stat. § 268.085, subd. 3(a)(2) (2012) (providing generally that applicants are not eligible to receive unemployment benefits for weeks they have received payments that are considered "wages" equal to or in excess of their unemployment benefit amount).

Engfer appealed the overpayment determination, and a ULJ affirmed. Engfer requested reconsideration, but did not challenge the ULJ's conclusion that, under Minn. Stat. § 268.035, subd. 29(a)(13), the SUB plan payments qualify as "wages." Instead, Engfer argued that the SUB plan was not valid under ERISA, 29 U.S.C. §§ 1001-461. The ULJ again affirmed, concluding that whether the SUB plan was valid under ERISA was not relevant to the determination of whether the plan provisions affected Engfer's eligibility for state unemployment benefits.

The court of appeals reversed the ULJ's decision in a divided decision, concluding that ERISA preempts the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), which provides that, in order for SUB plan payments to be excluded from the definition of "wages," "[t]he plan must provide supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits." *Engfer v. Gen. Dynamics Adv. Info. Sys., Inc.*, 844 N.W.2d 236, 241 (Minn. App. 2014). The dissent concluded that the provision is not preempted by ERISA. 844 N.W.2d at 244 (Schellhas, J., dissenting). We granted review to resolve the ERISA preemption issue.

5

# I.

DEED argues that the court of appeals erred in concluding that ERISA preempts what we refer to as "the timing provision" of Minn. Stat. § 268.035, subd. 29(a)(13), which provides that, in determining eligibility for state unemployment benefits, SUB plan payments are excluded from the definition of "wages" only if, among other conditions, the plan "provide[s] supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits." Specifically, DEED argues that the timing provision does not "relate to any employee benefit plan" under 29 U.S.C. § 1144(a), and therefore the timing provision is not preempted by ERISA. Alternatively, DEED argues that the General Dynamics plan is exempt from ERISA coverage under 29 U.S.C. § 1003(b) because the plan is maintained solely for the purpose of complying with applicable unemployment compensation laws. Engfer responds that the court of appeals correctly ruled that there was no overpayment of state unemployment benefits because ERISA preempts the timing provision.

This appeal concerns the interpretation and application of the ERISA preemption clause, which provides:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

29 U.S.C. § 1144(a). To resolve the preemption question, we will first address whether the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), "relate[s] to" an "employee benefit plan" under ERISA. 29 U.S.C. § 1144(a). We then will address

6

whether the General Dynamics plan is exempt from ERISA coverage under 29 U.S.C. § 1003(b).

Statutory interpretation is a question of law that we review de novo. *In re Welfare of J.J.P.*, 831 N.W.2d 260, 264 (Minn. 2013). Our goal in interpreting a state statute is to ascertain and effectuate the intent of the Legislature. Minn. Stat. § 645.16 (2014). When interpreting a statute, we give words and phrases their plain and ordinary meaning. *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72 (Minn. 2012). Further, we read the statute as a whole and give effect to all of its provisions. Our first step is to examine the language of the statute to determine whether it is ambiguous. *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 759 (Minn. 2010). Statutory language is ambiguous only if, as applied to the facts of the particular case, it is susceptible to more than one reasonable interpretation. *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). If the statutory language is unambiguous, we must enforce the plain meaning of the statute and not explore the spirit or purpose of the law. *Premier Bank*, 785 N.W.2d at 759.

Our approach in interpreting a statute enacted by Congress is the same. We first examine the language of the statute and give the words used their ordinary meaning. *Lawson v. FMR LLC*, ___ U.S. ___, 134 S. Ct. 1158, 1165 (2014). When a statute's language is plain, the sole function of the courts is to enforce the statute according to its terms. *Sebelius v. Cloer*, ___ U.S. ___, 133 S. Ct. 1886, 1896 (2013). We must presume that "a legislature says in a statute what it means and means in a statute what is says." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Thus, when the words of the

7

statute are unambiguous, the first step is also the last, and "judicial inquiry is complete." *Rubin v. United States*, 449 U.S. 424, 430 (1981).

A.

We begin our analysis with the state statutory provision. The Minnesota Unemployment Insurance Law provides temporary partial wage replacement to workers who are unemployed through no fault of their own. Minn. Stat. § 268.03, subd. 1 (2014). An applicant is not eligible for state unemployment benefits for any week he or she receives "wages" from his or her employer after completion of employment. *See* Minn. Stat. § 268.085, subd. 3(a)(2) (2012). The term "wages" is defined in Minn. Stat. § 268.035, subd. 29 (2014).[2] The statute excludes certain types of payments from the definition of "wages," including payments made under SUB plans that meet certain statutory conditions. *See* Minn. Stat. § 268.035, subd. 29(a)(1)-(17).

Subdivision 29(a)(13) generally excludes SUB plan payments from the definition of "wages." Under Minn. Stat. § 268.035, subd. 29(a)(13), "payments made to supplement unemployment benefits under a plan established by an employer" are not "wages" for purposes of Minnesota unemployment law. But the statute requires that the plan satisfy the following conditions in order for the exclusion to be available:

---

[2] "Wages" generally means "all compensation for employment, including commissions; bonuses, awards, and prizes; severance payments; standby pay; vacation and holiday pay; back pay as of the date of payment; tips and gratuities paid to an employee by a customer of an employer and accounted for by the employee to the employer; sickness and accident disability payments, except as otherwise provided in this subdivision; and the cash value of housing, utilities, meals, exchanges of services, and any other goods and services provided to compensate an employee." Minn. Stat. § 268.035, subd. 29(a).

8

The plan must provide supplemental payments solely for the supplementing of weekly state or federal unemployment benefits. The plan must provide supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits. The supplemental payments, when combined with the applicant's weekly unemployment benefits paid, may not exceed the applicant's regular weekly pay. The plan must not allow the assignment of supplemental payments or provide for any type of additional payment. The plan must not require any consideration from the applicant, other than a release of claims, and must not be designed for the purpose of avoiding the payment of Social Security obligations, or unemployment taxes on money disbursed from the plan.

*Id.* In this case, the General Dynamics SUB plan did not comply with the timing provision, which provides that "[t]he plan must provide supplemental payments only for those weeks the applicant has been paid regular, extended, or additional unemployment benefits." *Id.* Therefore, the supplemental payments that Engfer received under the General Dynamics SUB plan are counted as "wages" for purposes of determining his eligibility for unemployment benefits. Minn. Stat. § 268.035, subd. 29.

B.

There is no dispute that the General Dynamics SUB plan did not comply with the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13). The dispute here centers on whether ERISA preempts the timing provision. ERISA is a comprehensive federal law "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). ERISA imposes participation, funding, and vesting requirements on employee benefit plans. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990). ERISA also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for covered plans. *Shaw*, 463 U.S. at 91.

9

The determination of whether a state law is preempted by federal law is a question of congressional intent. *Ingersoll-Rand*, 498 U.S. at 137-38. Congressional purpose is "the ultimate touchstone" of the preemption inquiry. *Id.* at 138. According to the Supreme Court, Congress intended to make the regulation of employee benefit plans "exclusively a federal concern," *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981), and to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans," *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657 (1995). To discern the intent of Congress, we examine the statutory language and the structure of the statute. *Id.* at 655; *Shaw*, 463 U.S. at 95.

Our analysis begins with the language of the ERISA preemption clause, which provides that the provisions of ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." 29 U.S.C. § 1144(a). The Supreme Court has observed that the language of the ERISA preemption clause is deliberately broad. *Ingersoll-Rand*, 498 U.S. at 138. Specifically, ERISA preempts any state law that "relate[s] to any employee benefit plan" described in section 1003(a) and that is not exempt under section 1003(b). 29 U.S.C. § 1144(a). In *Alessi*, the Supreme Court explained the ERISA preemption analysis under 29 U.S.C. § 1144(a). On the one hand, the Court concluded the only state laws that survive, or fall outside, the broad reach of the ERISA preemption clause are those that do not "relate to" employee benefits plans under section 1003(a) of ERISA. 451 U.S. at 523 n.20. On the other hand,

10

a state law that "relate[s] to" employee benefit plans under section 1003(a) of ERISA, may nonetheless "survive ERISA preemption" if all of the employee benefit plans covered by the state law fall within the exception to ERISA coverage under section 1003(b). *Id.*

DEED concedes that the General Dynamics SUB plan is an "employee benefit plan" under ERISA. An "employee benefit plan" includes an "employee welfare benefit plan" established or maintained by an employer for the purpose of providing its participants or their beneficiaries with certain benefits set forth in ERISA, including unemployment benefits. 29 U.S.C. §§ 1002(1), 1003(a). In this case, General Dynamics established the SUB plan for the purpose of providing plan participants with supplemental unemployment benefits in addition to state or federal unemployment benefits. Therefore, the General Dynamics SUB plan, which is covered by Minn. Stat. § 268.035, subd. 29(a)(13), satisfies the definition of an "employee benefit plan" described in section 1003(a) of ERISA.[3]

## C.

Having established that the General Dynamics SUB plan is an "employee benefit plan" under ERISA, we must next determine whether the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), "relate[s] to" the plan for purposes of the ERISA preemption clause, 29 U.S.C. § 1144(a). DEED argues that the timing provision in subdivision

---

[3] The dissent argues that because the General Dynamics SUB plan is not part of the record, the court is unable to decide whether the plan is covered by ERISA. Because DEED concedes that the General Dynamics plan satisfies the definition of an "employee benefit plan" under ERISA, this argument fails.

29(a)(13), which requires the SUB plan to pay benefits only for weeks that the plan participant was paid unemployment benefits, does not "relate to" the plan and therefore is not preempted under 29 U.S.C. § 1144(a). According to DEED, the conditions in subdivision 29(a)(13) merely identify the supplemental payments that are excluded from the calculation of an individual's "wages" for purposes of determining eligibility for state unemployment benefits, and therefore the provision does not interfere with ongoing SUB plan payments or bind plan administrators in a particular way. Engfer responds that there is "no doubt" that the timing provision "relate[s] to" the General Dynamics plan because the provision places restrictions on the timing of supplemental payments by limiting payments only to weeks the applicant has been paid unemployment benefits.

The Supreme Court has held that the phrase "relate to any employee benefit plan" in the ERISA preemption clause, 29 U.S.C. § 1144(a), means a state law that "has a connection with or reference to such a plan." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983)). The Court has observed that the phrase "relate[s] to" is deliberately broad and expansive, and establishes that regulation of employee benefit plans is exclusively a federal concern. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). Notably, Congress used equally broad language to define "State law" as "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1). According to the Court, a state law is preempted "even if the law is not specifically designed to affect [ERISA] plans, or the effect is only indirect." *Ingersoll-Rand*, 498 U.S. at 139. Thus, the Court's ERISA

12

preemption jurisprudence examines whether the state law has a connection with or makes reference to an ERISA employee benefit plan to determine whether the state law "relate[s] to" the plan. *Travelers*, 514 U.S. at 656.

We begin our analysis by examining whether the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), has "a connection with" the General Dynamics SUB plan. *Travelers*, 514 U.S. at 656. To determine whether a state law has the forbidden "connection with" an employee benefit plan, we examine the objectives of ERISA as a guide to the scope of the state law that would survive preemption, and the nature of the effect of the state law on the plan. *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997); *see also Travelers*, 514 U.S. at 661.

In *Egelhoff v. Egelhoff*, the Supreme Court considered whether a Washington state law, which provided for the automatic revocation upon divorce of the spousal beneficiary designation for nonprobate assets consisting of life insurance proceeds and pension plan benefits, had a connection with ERISA-covered plans and therefore was preempted by ERISA. 532 U.S. 141, 143 (2001). Applying the framework from *Travelers* and *Dillingham*, the Court concluded that the state statute had an impermissible connection with an ERISA plan because it bound plan administrators to a particular choice of rules for determining beneficiary status. *Id*. at 147. Specifically, plan administrators were required to pay benefits to the beneficiaries chosen by the state law, rather than to those identified in the plan documents. *Id.* The state statute therefore implicated the payment of benefits, an area of core ERISA concern. *Id*. Moreover, the state statute interfered with nationally uniform plan administration. *Id*. at 148. Specifically, plan administrators

13

could not make payments simply by identifying the beneficiary specified in the plan documents; instead, the administrators were forced to familiarize themselves with state statutes in order to determine whether the named beneficiary's status had been "revoked" by operation of the state law. *Id.* at 148-49.

We conclude that the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), which requires a SUB plan to pay benefits only for weeks that the plan participant was paid unemployment benefits, has a "connection with" the General Dynamics plan.[4] Two reasons support this conclusion. First, the timing provision in subdivision 29(a)(13) restricts the ability of a SUB plan to supplement state unemployment benefits during certain time periods, such as during the 1-week waiting period for state unemployment benefits. As a result, supplemental benefits paid to an unemployed individual during restricted time periods constitute "wages" and affect the individual's eligibility for state unemployment compensation benefits. *See* Minn. Stat. § 268.085, subd. 3(a)(2). Moreover, if the individual is not eligible for state unemployment benefits because the SUB plan payments constitute "wages," then the individual is not eligible for SUB plan payments either because the SUB plan requires plan participants to prove and maintain eligibility for state unemployment benefits.

---

[4] The dissent correctly points out that there is a presumption against preemption in areas of traditional state regulation. The Court, however, explained in *Egelhoff* that this presumption may be overcome when Congress has "made clear its desire for preemption." 532 U.S. at 151. The Court indicated that it has not "hesitated to find state . . . law pre-empted when it conflicts with ERISA or relates to ERISA plans" when there is a connection between the state law and an ERISA plan. *Id.* We rely on that connection here too.

14

Consequently, Minn. Stat. § 268.035, subd. 29(a)(13), operates to undermine the purpose of a SUB plan to supplement state unemployment benefits. The payment of ERISA plan benefits is an area of core ERISA concern. *Egelhoff*, 532 U.S. at 147 (concluding that the state law was preempted because it governed the payment of benefits). To avoid this result, plan administrators would need to modify SUB plans for Minnesota participants in order to comply with Minnesota law. Therefore, the state statute requires plan administrators to make certain choices in providing supplemental unemployment benefits to unemployed individuals in Minnesota.[5]

Second, the state law interferes with the ERISA objective of nationally uniform administration of employee benefit plans. *See Egelhoff*, 532 U.S. at 148; *Travelers*, 514 U.S. at 656-57. Such uniformity is impossible if SUB plans are subject to different conditions in different states. Here, plan administrators would need to familiarize

---

[5] The dissent maintains that the conditions set forth in Minn. Stat. § 268.035, subd. 29(a)(13), do not impose any requirements on SUB plans because plan administrators may choose to provide SUB benefits in compliance with state law or choose to ignore state law and provide benefits in any manner they wish. The dissent's argument that plan administrators have a choice is not a choice at all. The dissent acknowledges that "the premise" of the General Dynamics SUB plan is that discharged employees will receive both state unemployment benefits and SUB plan payments. The dissent further acknowledges that federal law requires SUB plan payments to be linked to the receipt of state unemployment compensation. But when a SUB plan does not comply with state law, as here, plan participants delay or lose their eligibility for state unemployment benefits. Consequently, the supplemental payments are not in fact supplemental. Moreover, since payments under a SUB plan "*depend[] on* state benefits," as the dissent recognizes, any benefits provided under a nonconforming SUB plan are purely illusory. In short, the failure of the SUB plan to comply with state law eviscerates the very premise of the plan, as well as the benefits contemplated to be paid under the plan. Therefore, the effect of the Minnesota law on the General Dynamics SUB plan cannot reasonably be characterized as merely "incidental."

15

themselves with Minnesota law so that they can determine when SUB plan payments may be made without negatively affecting the participant's eligibility for state unemployment benefits. *See Egelhoff*, 532 U.S. 148-49. Requiring SUB plan administrators to master the relevant laws of the various states would undermine the goal of Congress to "minimize the administrative and financial burden" on plan administrators. *Ingersoll-Rand*, 498 U.S. at 142. "The 'tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction' is exactly the burden ERISA seeks to eliminate." *Egelhoff*, 532 U.S. at 151 (quoting *Ingersoll-Rand*, 498 U.S. at 142).

DEED and the dissent argue that the conditions set forth in subdivision 29(a)(13) do not come into effect until after the participant has received SUB plan payments, and therefore, the conditions do not affect SUB plans. It may be factually correct that the calculation of "wages" under the unemployment statutes and the determination of eligibility for state unemployment benefits are not resolved until after the SUB plan payments have been made. But the proper inquiry is whether the state law "relate[s] to" an ERISA-governed employee benefit plan. 29 U.S.C. § 1144(a). That inquiry does not depend on the temporal aspect of when the benefits are received. Instead, the inquiry focuses on whether plan administrators may need to restructure employee benefit plans to comply with the conditions of subdivision 29(a)(13). *See Egelhoff*, 532 U.S. at 147. Here, if the state law is not preempted, plan administrators would need to change their SUB plans to achieve the objective of supplementing state unemployment benefits. Thus, the state law directly affects the substantive coverage and administration of SUB plans.

16

In sum, we hold that the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), which requires SUB plans to provide supplemental payments only for weeks that the plan participant was paid unemployment benefits in order for the supplemental payments to be excluded from the definition of "wages," relates to the General Dynamics SUB plan, an employee benefit plan under ERISA. Specifically, the statutory condition has a connection with the substantive coverage and administration of the plan. Moreover, the condition effectively binds plan administrators to certain choices and interferes with the ERISA objectives of avoiding a multiplicity of regulation and permitting the nationally uniform administration of employee benefit plans.[6]

II.

Having concluded that the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), is connected with and thus "relate[s] to" the General Dynamics plan, an employee benefit plan described in 29 U.S.C. § 1003(a), the timing provision is preempted by ERISA unless the General Dynamics plan is exempt from ERISA coverage under 29 U.S.C. § 1003(b). 29 U.S.C. § 1144(a). DEED argues that the General Dynamics plan is exempt from ERISA coverage under 29 U.S.C. § 1003(b)(3) because the plan is maintained solely for the purpose of complying with applicable unemployment compensation laws. Engfer counters that DEED failed to raise the exemption issue

---

[6] Because we conclude that the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), has a "connection with" an employee benefit plan, we need not consider whether the timing provision also makes "reference to" such a plan. *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 656 (1995) (holding that a state law that has a "connection with *or* reference to" an ERISA employee benefit plan is preempted by ERISA (emphasis added)).

17

below, and therefore the issue is not properly before us. Engfer also argues that DEED's argument lacks merit.

We first address whether to consider the exemption issue, because DEED did not raise this issue in the court of appeals. Although generally we will not consider an issue raised for the first time on appeal, *State v. Sontoya*, 788 N.W.2d 868, 874 (Minn. 2010), we may review any "matter as the interest of justice may require," Minn. R. Civ. App. P. 103.04. Further, we may base our decision upon a theory not previously presented or considered where the issue is "plainly decisive of the entire controversy on its merits" and where "there is no possible advantage or disadvantage to either party in not having had a prior ruling by the trial court on the question." *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 687 (Minn. 1997) (quoting *Holen v. Minneapolis-St. Paul Metro. Airports Comm'n*, 250 Minn. 130, 135, 84 N.W.2d 282, 286 (1957)).

Because resolving whether the General Dynamics plan is exempt from ERISA coverage under 29 U.S.C. § 1003(b) is clearly essential to our ERISA preemption analysis, we will resolve the issue. *See* 29 U.S.C. § 1144(a) (stating that a state law is preempted if it relates to "any employee benefit plan described in section 1003(a) of this title *and not exempt under section 1003(b)* of this title" (emphasis added)); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 n.20 (1981) ("The only relevant state laws, or portions thereof, that survive [ERISA] preemption . . . are those relating to plans that are themselves exempted from ERISA's scope."). Moreover, the parties have briefed the issue, and all of the relevant facts are before us.

18

The ERISA exemption provision sets forth certain types of employee benefit plans that are not covered by ERISA. 29 U.S.C. § 1003(b). It provides in relevant part:

> The provisions of this subchapter shall not apply to any employee benefit plan if . . . (3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws.

29 U.S.C. § 1003(b)(3).[7]

We conclude that the text of the ERISA exemption clause in section 1003(b)(3) is clear and unambiguous. Specifically, an employee benefit plan that is maintained solely for the purpose of complying with state unemployment compensation laws is not covered by ERISA.

In *Shaw v. Delta Air Lines, Inc.*, the Supreme Court explained the meaning of the exemption in section 1003(b)(3). 463 U.S. 85, 107 (1983). The *Shaw* Court considered whether a New York disability benefits law, which required that employers pay sick-leave benefits to employees who were unable to work because of pregnancy, was preempted by ERISA. *Id.* As part of its analysis, the Court considered whether the employee benefit plans affected by the law were exempt from ERISA coverage under 29 U.S.C. § 1003(b)(3). *Id.* The Court concluded that to satisfy the exemption provision in section 1003(b)(3), the plan, as an administrative unit, must provide "only those benefits required by the applicable state law." *Id.* The Court reasoned that the use of the word

---

[7] ERISA also exempts from its coverage government plans, church plans, and plans maintained outside the United States primarily for the benefit of nonresident aliens, or unfunded excess benefit plans. 29 U.S.C. § 1003(b)(1)-(2), (4)-(5). These exemptions are not applicable to the SUB plan at issue here.

"solely" in section 1003(b)(3) demonstrates that to be exempt from ERISA, the purpose of the entire plan must be to comply with the applicable state disability insurance law. *Id.* The Court concluded that the employer's multi-benefit plan was not exempt from ERISA coverage because the plan was not a separately administered plan maintained solely to comply with New York disability law. *Id.* at 108.

The *Shaw* Court observed, however, that a state "may require an employer to maintain a disability plan complying with state law as a separate administrative unit." *Id.* According to the Court, if a state "is not satisfied that the ERISA plan comports with the requirements of its disability insurance law, it may compel the employer to maintain a separate plan that does comply." *Id.* But the state may not require employers to alter ERISA plans. *Id.* Moreover, employee benefit plans that not only provide benefits required by state disability insurance laws but also "more broadly serve employee needs as a result of collective bargaining" are not exempt under section 1003(b)(3). *Id.* at 107 (quoting *Alessi*, 451 U.S. at 523 n.20).

We conclude that the General Dynamics SUB plan, which is covered by Minn. Stat. § 268.035, subd. 29(a)(13), is not exempt from ERISA coverage under 29 U.S.C. § 1003(b)(3). The scope of the exemption clause under section 1003(b)(3) is limited to plans maintained solely to comply with applicable state workers' compensation, unemployment compensation, or disability insurance laws. The phrase "maintained solely to comply with" applicable state laws means a plan that "provides only those benefits required" by the state laws. *Shaw*, 463 U.S. at 107. Minnesota law, however, does not *require* employers to pay supplemental unemployment benefits. The General

20

Dynamics SUB plan is designed and maintained to provide supplemental unemployment compensation benefits in excess of the benefits provided under state law. Therefore, the plan is not maintained solely for the purpose of complying with applicable unemployment compensation laws.[8]

DEED urges us to consider the context in which the ERISA exemption provision was enacted. Specifically, DEED notes that, unlike state disability insurance and workers' compensation laws, no state requires employers to maintain private unemployment compensation benefit plans. Because SUB plans were regulated by the states at the time ERISA was enacted, DEED contends that Congress intended to carve out an exemption for SUB plans in section 1003(b)(3), as this is the only type of plan that an employer would maintain to comply with a state's unemployment compensation laws.

We conclude that the language of section 1003(b)(3) is unambiguous, and therefore we need not go beyond the text of the statute. When the words of a statute are unambiguous, judicial inquiry is complete. *Bank One Chi., N.A. v. Midwest Bank & Trust Co.,* 516 U.S. 264, 279 (1996) (Scalia, J., concurring in part and concurring in judgment) ("[A] law means what its text most appropriately conveys, whatever the Congress that enacted it might have 'intended.' The law *is* what the law *says,* and we should content ourselves with reading it rather than psychoanalyzing those who enacted it."); *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."); *Rubin v. United States*, 449

---

[8]     The dissent rightly concedes that the SUB plan at issue in this case is not exempt from ERISA coverage under 29 U.S.C. § 1003(b)(3).

U.S. 424, 430 (1981). Regardless of the status of SUB plans at the time of ERISA's enactment, ERISA is clear that such a plan must be maintained solely to comply with state unemployment compensation laws to be exempt under section 1003(b).

DEED next argues that SUB plans *must* comply with state unemployment compensation laws because an employee's receipt of supplemental unemployment benefits is conditioned on the receipt of state unemployment benefits. DEED's argument is unavailing. The inquiry under section 1003(b)(3) is not whether the SUB plan complies with state unemployment laws; instead, the inquiry is whether the supplemental plan is "maintained *solely* for the purpose of complying with" state unemployment laws. 29 U.S.C. § 1003(b)(3) (emphasis added). SUB plans like the General Dynamics plan are not maintained solely for the purpose of complying with applicable state unemployment laws. Therefore, the General Dynamics plan is not exempt from ERISA coverage under section 1003(b)(3), and in turn, based upon our analysis above, the conditions placed upon SUB plans by the state law do not survive ERISA preemption. *See Alessi*, 451 U.S. at 523 n.20.

In sum, we conclude that ERISA preempts the timing provision in Minn. Stat. § 268.035, subd. 29(a)(13), relating to supplemental payments under a SUB plan because the provision "relate[s] to" an employee benefit plan under 29 U.S.C. § 1003(a), and the General Dynamics SUB plan is not maintained solely for the purpose of complying with applicable unemployment compensation laws under 29 U.S.C. § 1003(b)(3). Accordingly, the SUB plan payments Engfer received are not "wages" for purposes of his

eligibility for state unemployment benefits, and he was not overpaid state unemployment benefits.

Affirmed.

DISSENT

LILLEHAUG, Justice (dissenting).

The chief question presented in this case is whether the definition of "wages" in the Minnesota unemployment insurance statute is preempted by ERISA. I disagree with the majority that the Minnesota definition has a "connection with" ERISA plans and is thereby preempted.

The majority finds such a connection based on its concern that the definition of "wages" under Minnesota law will "bind" or "require" plan administrators to make certain choices for their Minnesota employees. The definition does no such thing, and the majority's reasoning fundamentally misstates the nature of the preemption inquiry. The goal of ERISA preemption, as it is relevant to this case, is to allow plan administrators to provide a uniform benefit without regard to differences in state law, if they wish to do so. But the entire point of a supplemental unemployment benefit (SUB) plan is to provide a benefit that *varies based on* differences in state law. If plan administrators wish to provide a severance benefit that is uniform across state lines, they can easily do so. But if they wish to provide a benefit—like the benefit provided by a SUB plan—that adapts to the unemployment insurance law of Minnesota and the differing laws of other states, they must take state law as they find it. The alternative, embraced by the majority here, allows the existence of a corporation's SUB plan to dictate the conditions under which our state government must pay unemployment benefits to terminated employees. Because nothing in ERISA requires such a result, I respectfully dissent.

I.

Minnesota Statutes Chapter 268, Minnesota's unemployment insurance statute, contains a detailed definition of "wages." *See* Minn. Stat. § 268.035, subd. 29 (2014).[1] "Wages" means "all compensation for employment." *Id.*, subd. 29(a). Relevant here is that "compensation" includes "severance payments." *Id.* Commonly understood, severance pay is "[m]oney (apart from back wages or salary) that an employer pays to a dismissed employee. The payment may be made in exchange for a release of any claims that the employee might have against the employer." *Severance Pay*, *Black's Law Dictionary* (10th ed. 2014).

In Minnesota's program, a worker is not eligible to receive unemployment benefits for any week in which the worker receives "severance pay, bonus pay, or any other payments paid by an employer because of, upon, or after separation from employment." Minn. Stat. § 268.085, subd. 3(a)(2) (2012). But under an exception to this rule, a worker may receive unemployment benefits if the severance payment is not considered "wages" under section 268.035, subd. 29. Minn. Stat. § 268.085, subd. 3(a)(2). There are 17 exceptions to the definition of "wages" in subdivision 29(a). One such exception, which was added by the Legislature in 2007, deals with SUB plan payments. That exception, as amended in 2011, 2012, and 2014, and now numbered (13), excludes from the definition

---

[1] The definition of wages is used for at least two purposes. First, the definition is used to determine whether the unemployed person is eligible for state benefits and, if so, how the benefits are calculated. *See* Minn. Stat. § 268.07 (2014). Second, the definition is used to trigger and calculate the employer's obligation to pay state unemployment insurance tax. *See* Minn. Stat. § 268.051 (2014).

of "wages" the following: "payments made to supplement unemployment benefits under a plan established by an employer."

The exception for SUB plan payments contains six limitations. First, the payments must be "solely for the supplementing of weekly state or federal unemployment benefits." Minn. Stat. § 268.035, subd. 29(a)(13). Second, the payments must be only for weeks when the employee has been paid unemployment benefits. Third, the payments, together with benefits from the state, must not exceed the employee's regular weekly pay. Fourth, the payments may not be assigned or increased. Fifth, the payments cannot be for consideration other than a release of claims. Sixth, the plan must not be designed to avoid Social Security or unemployment taxes. *Id.*

To sum up the statutory scheme: payments, however denominated, from an employer to a terminated employee are "severance payments" and thus "wages" for purposes of state unemployment insurance tax assessment and benefits, unless the payments fit within the exception, with limitations, in subdivision 29(a)(13). While I have not located any illuminating legislative history on subdivision 29(a)(13), it makes sense that Minnesota has chosen to include "severance payments" within its broad definition of "wages," carving out only a limited exception for payments from certain SUB plans that are truly supplemental.

Therefore, Minnesota's unemployment insurance program, like that of many other states, provides a series of choices for both the employer and the terminated employee. The employer has the choice to terminate the employee. The employer has the choice to offer severance benefits to the employee. The employer has the choice to offer severance

benefits that fit, or do not fit, with the state's unemployment insurance program. The employee has the choice to apply for and receive state unemployment benefits. And the employee has the choice to accept the employer's offer of severance benefits (in exchange for a release), understanding that acceptance of the severance benefits may affect the employee's eligibility for state benefits.

## II.

With this background, I turn now to the problem posed by this case, which is created by the General Dynamics Employee Transition Benefit Plan (the Plan). The Plan was offered by an employer, General Dynamics, which did not appear at the unemployment law judge (ULJ) and court of appeals hearings, and did not file a brief or appear before us. The parties that did appear, the employee and the State, did not put the Plan into the record.[2]

We have in the record only a "Frequently Asked Questions" brochure that purports to describe some of the Plan's terms. The brochure emphasizes that the first step for the employee is to "sign a copy of the [severance] agreement and release that you received from the [sic] General Dynamics and return it to your Human Resources Representative." This makes clear that the SUB payments are consideration given in exchange for the release.

---

[2] For this reason alone, if for no other, the majority errs in holding that the state law defining "wages" is "connected to" the Plan and thereby preempted by ERISA. Given that the ULJ, the court of appeals, and this court have never even seen the Plan, how can we determine exactly if and how the state law and the Plan are "connected"?

The next step, advises the brochure, is to "apply for unemployment compensation." According to the brochure, the premise of the Plan is that the employee will receive state unemployment benefits and then receive SUB payments, which will consist of the employee's weekly wage minus the state benefits received.

Despite the obvious fact that the SUB payments under the Plan are severance payments (and thus wages) under Minnesota law, the brochure instructs the employee: "Do not declare these amounts as severance benefits when applying for state unemployment benefits. These payments are supplemental unemployment compensation benefits awarded through the General Dynamics Corporation Employment Transition Benefit Plan qualified under the provisions of the Employee Retirement Income Security Act of 1974 as amended. Reporting these amounts as severance payments could jeopardize your claim for ETB [Plan] payments."

The employee seems to have done as instructed by General Dynamics. He applied for and was deemed eligible for state benefits. But the Plan made a SUB payment during the first week when the employee was not yet eligible to receive state benefits. When the State learned that the employee was receiving payments that would constitute severance payments and thus "wages" under Minnesota law, the State sought and received an order from the ULJ recouping a portion of the state benefits. The record is silent on whether the Plan has reimbursed the employee for the amount recouped by the State or whether the Plan has recouped from the employee the SUB payments he received from the Plan.

## III.

The employee (with the employer and the Plan perhaps just off stage) now makes a novel legal argument: that ERISA somehow preempts the definition of "wages" in the state unemployment insurance program, thus allowing the employee to keep all state benefits *and* all Plan benefits.

Whether ERISA preempts a state law is a question of congressional intent. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137-38 (1990). A state law is preempted if it "relate[s] to any employee benefit plan" described and not exempt. 29 U.S.C. § 1144(a) (2012). As the majority indicates, the chief question here is whether the state law "has a connection with . . . such a plan." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995).[3]

In deciding whether state law is preempted, we start with the presumption that Congress did not intend to supplant state law. *Travelers*, 514 U.S. at 654. Particularly when it concerns a field of traditional state regulation, we assume that Congress did not intend to supersede a state's historic police powers unless Congress' purpose is "clear and manifest." *Calif. Div. of Labor Standards Enforcement v. Dillingham*, 519 U.S. 316,

---

[3] A state law may also be preempted if it "has a . . . reference to" an ERISA plan. *Travelers*, 514 U.S. at 656. The Supreme Court has reasoned that "where a [S]tate's law acts immediately and exclusively upon ERISA plans . . . or where the existence of ERISA plans is essential to the law's operation . . . that 'reference' will result in pre-emption." *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997). Here, the definition of "wages" in Minn. Stat. § 268.035, subd. 29(a) does not act immediately and exclusively on ERISA plans. Put another way, the existence of an ERISA plan is not essential to the law's operation. *Ingersoll-Rand*, 498 U.S. at 140. Thus I would hold that the definition of wages in Minn. Stat. § 268.035, subd. 29(a) is not preempted because of a forbidden "reference to" ERISA plans.

325 (1997). Although the Supreme Court has stated that a state law may "relate to" ERISA plans "even if the law is not specifically designed to affect such plans, or the effect is only indirect," *Ingersoll-Rand*, 498 U.S. at 139, the Court has also cautioned against an "uncritical literalism" that would make preemption turn on "infinite connections." *Travelers*, 514 U.S. at 656. Specifically, the Court has made clear that state laws that have only "[a]n indirect economic influence" on ERISA-governed plans and which "do[] not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself," nor "preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one," are *not* preempted. *Travelers*, 514 U.S. at 659-60. In particular, state laws that "alter[] the incentives, but do[] not dictate the choices, facing ERISA plans," are not preempted. *Dillingham*, 519 U.S. at 334.

In my view, it is clear that the definition of "wages" in Minn. Stat. § 268.035, subd. 29(a) falls comfortably within the category of state laws that are not subject to preemption. Indeed, the employee, the court of appeals majority, and the majority here have not pointed to any congressional desire to preempt state unemployment insurance provisions. There is nothing in ERISA, legislative history, case law, or the record to show that Congress intended to have ERISA preempt a *definition* that affects how the State assesses taxes for, and pays benefits from, its own unemployment insurance program. There is not even a hint in ERISA that a state cannot define "wages" however it sees fit for purposes of its unemployment insurance program. The definition of "wages" is a critical part of the state's taxing, spending, police, and welfare powers, so

there must be a "clear and manifest" intent to preempt it. *See Dillingham*, 519 U.S. at 325. There is none. "This is not a case in which [Minnesota] has forbidden a method of calculating . . . benefits that federal law permits, or required employers to provide certain benefits. Nor is it a case in which the existence of a [benefit] plan is a critical element of a state-law cause of action, or one in which the state statute contains provisions that expressly refer to ERISA or ERISA plans." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814-15 (1997) (footnotes omitted).

Nevertheless, the majority finds a congressional intent to preempt Minnesota's definition of "wages" based on the definition's indirect effects on benefits paid out under SUB plans. By the majority's account, the practical effect of Minnesota's definition of "wages" is make plan administrators "modify SUB plans for Minnesota participants," thereby "requir[ing] plan administrators to make certain choices." Similarly, the court of appeals majority asserted that, without preemption, plan administrators would be "coerced" to modify their plans.

The majority's conclusion is incorrect as a factual matter. The definition of "wages" in the Minnesota unemployment insurance program does not bind any administrator. When General Dynamics and other corporations choose to terminate employees, they can choose to offer, or not offer, a severance package that includes SUB pay. They can offer a uniform severance benefit package not tailored to state unemployment benefits eligibility, or they can offer a package that is truly "supplemental" to state benefits which, of necessity, vary from state to state. Indeed, the entire *purpose* of "supplemental" benefits is that they take those variations among states

into account in some way. Although Minnesota law (or the law of other states) might prompt plan administrators to make certain choices in order to accomplish their desired goal (allowing a terminated employee to continue receiving a weekly severance payment equal to her normal salary), nothing about Minnesota's definition of wages "binds" or "requires" plan administrators to do anything whatsoever. Indeed Minnesota's definition does not impose *any* requirements, obligations, or limitations on severance plans or on their administrators. And at oral argument, both parties agreed that there is not a bit of evidence in the record that, since the Minnesota definition was enacted into statute in 2007, plan administrators have been required by Minnesota to modify their SUB plans.[4] In other words, Minnesota's definition "alters the incentives, but does not dictate the choices" for plan administrators. *See Dillingham*, 519 U.S. at 334.

Thus, the situation in this case is entirely unlike that in *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001), from which the majority draws support. In *Egelhoff*, the Supreme Court of the United States considered a Washington statute providing for automatic revocation, upon divorce, of any designation of a spouse as beneficiary of a nonprobate asset. The court held that the statute was preempted by ERISA, because it "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status," in that it

---

[4]    SUB plan administrators know that their plans "generally must comply with state law requirements (which may differ from the IRS's requirements) and some states are required to approve" such plans. Vicki M. Nielsen, *The Advantages of Offering Supplemental Employment Benefits Instead of Severance, Part I: FICA Taxes and More*, Ogletree Deakins (Aug. 26, 2013), http://www.ogletreedeakins.com (last visited Aug. 27, 2015). Georgia and Iowa, for example, require that SUB benefits are wages unless the SUB plan is approved in advance. *See* Ga. Comp. R. & Regs. 300-2-4.05 (2015); Iowa Admin. Code. r.871-23.3(2)(e) (2015).

requires administrators to "pay benefits to the beneficiaries chosen by state law, rather than to those identified in the plan documents," an "area of core ERISA concern." *Id.* at 147. Noting that ERISA requires that ERISA plans make payments as set out in their plan documents, the Court in *Egelhoff* specifically distinguished between the situation it faced and "generally applicable laws regulating 'areas where ERISA has nothing to say,' which we have upheld notwithstanding their incidental effect on ERISA plans." *Id.* at 147-48 (citation omitted). In this case, the majority picks up on the language that payment of benefits to a specific beneficiary is an "area of core ERISA concern." But the Minnesota statute at issue in this case does not require the Plan to make payments to any particular beneficiary; indeed, it does not *directly* affect SUB plans, their administrators, or the payments they make in any way. Instead, the Minnesota statute is a generally applicable law with only an "incidental effect" on ERISA plans, which *Egelhoff* noted is typically not preempted.

But, the majority argues, the effect of the definition of wages under Minnesota law is to "undermine the purpose of a SUB plan to supplement state unemployment benefits." This puts the cart before the horse. By its very name, SUB pay is "supplemental"; in other words, it is designed to provide a benefit that supplements and *depends on* state benefits. ERISA preemption protects the right of a plan to provide "a uniform interstate benefit package *if a plan wishes to provide one*," *Travelers*, 514 U.S. at 660 (emphasis added), but it does not address the situation when a plan intentionally chooses to pay benefits that vary according to state law. Generally, SUB pay "must be linked to the receipt of state unemployment compensation," Rev. Rul. 90-72, 1990-2 C.B. 211.

Unemployment compensation may be generous in some states and meager in others; SUB plans attempt to take this into account so that the total of the state and SUB benefits replace the employee's pre-termination salary. It is easy to imagine why they might wish to do so: by structuring their plans so that employees can receive plan benefits while still remaining eligible for state-provided unemployment benefits, SUB plans potentially improve the terminated employees' bottom lines, making the benefit more valuable to the employees and therefore to the employer. This is a perfectly rational business decision, but it has nothing to do with providing a "uniform interstate benefit package."

Having elected to pay a benefit that depends on state unemployment benefits, SUB plans must then take those state benefits as they find them. An employer can choose to structure its SUB plan to fit with each of many different state programs, or the SUB plan can be structured so that, depending on the employee's state, benefits may be limited. In this case, General Dynamics chose to structure the Plan in a way that risked the employee's right to Minnesota benefits, while advising the employee to apply for and receive Minnesota benefits without characterizing the SUB payments as severance.

Viewed in this light, the majority's conclusion that Minnesota's statutory definition of "wages" has a "connection with" an ERISA plan sufficient to support preemption is not well taken. By the majority's reasoning, severance plans could dictate when, and even by what formula, the state must pay benefits when the employee receives severance payments. The Plan specifies that it will not pay out a greater benefit than the employee's pre-termination weekly salary reduced by the unemployment compensation payment, but under the majority's reasoning, a SUB plan could be more generous,

allowing a terminated employee to receive a multiple of his weekly pay, and ERISA would still preempt any state definition of wages that "undermines the purpose of a SUB plan to supplement state unemployment benefits" to the higher amount desired by the plan administrator. Indeed, if a plan had the "purpose" of allowing a terminated employee to receive a one-time lump-sum severance payment equal to one year of pay at the pre-termination rate, without affecting the employee's eligibility for unemployment benefits, the majority's reasoning would still apply and would bar a state from defining such a payment as severance pay. This cannot be what Congress intended.

The majority also finds preemption to be appropriate based on ERISA's purpose of permitting "nationally uniform administration of employee benefit plans." The Supreme Court has advised that "[u]niformity is impossible . . . if plans are subject to different legal obligations in different States." *Egelhoff*, 532 U.S. at 148. But Minnesota's definition of "wages" does not "obligate" severance plans to do anything at all. The definition of wages does not affect the benefits payable under severance plans, when those benefits are payable, to whom they are payable, what consideration must be given to entitle an employee to receive them, or any other details of the payments; all such matters are determined by the relevant plan documents and the plan administrator.[5]

---

[5] To be sure, in this case it appears that in order to determine whether it is proper to make a payment under the Plan, the plan administrator must determine whether the employee is eligible for state unemployment benefits, and therefore to a certain extent the plan administrator must be familiar with Minnesota's definition of "wages." But this requirement is not imposed by the Minnesota definition, but by the Plan itself, which (the majority tells us, although we do not have the Plan before us) "required Engfer to . . . be found eligible for state unemployment benefits."

Instead, the definition of wages affects only the amount of taxes collected, and benefits paid out, *by the State of Minnesota*.

Moreover, the entire premise of a SUB plan is that the administrators may (but are not required to) familiarize themselves with the law of each state if they want their plans to pay benefits "supplemental" to state benefits. A SUB plan administrator has no need "to master the relevant laws of the various states," as the majority complains, unless it wishes to take those laws into account to maximize the ex-employees' (state unemployment compensation) benefits. Essentially, the majority holds that ERISA requires states to pay uniform unemployment compensation benefits so that it is convenient for SUB plan administrators to design plans to supplement them. Again, Congress cannot have intended this, especially in light of the presumption that Congress did not intend to supplant state law.

There are several additional reasons to believe that Congress had no such intent. First, the entire structure of unemployment insurance is a federal-state partnership that grew out of the Social Security Act. Within this framework, the federal government establishes minimum standards for unemployment compensation programs while the states create and administer their own tax and benefit structures. That framework, which well pre-dates ERISA, would be upset by the majority's analysis.[6]

---

[6] There was no right at common law to state unemployment benefits. *See* Minn. Stat. § 268.069, subd. 3 (2014). Instead, starting with the Social Security Act of 1935, unemployment insurance developed as a "federal-state partnership based upon federal law, but administered by state employees under state law." U.S. Department of Labor, *Unemployment Compensation: Federal-State Partnership* 1 (2014) (*Federal-State*

(Footnote continued on next page.)

Second, the exemption from ERISA for SUB plans maintained solely for the purpose of complying with applicable unemployment compensation laws, *see* 29 U.S.C. § 1003(b) (2012), while not controlling here, at least suggests that Congress did not intend to limit a state's ability to decide the scope of, and formula for, state benefits.

Third, as the employee's Earning Statements from the Plan, which are in the record, show, SUB payments such as these are "income" subject to federal and state tax. How can they not be "wages" here?

Finally, although we have not previously decided the precise issue here, a conclusion that ERISA does not preempt the definition of "wages" fits better with our closest precedent, *Gilhousen v. Ill. Farmers Ins. Co.*, 582 N.W.2d 571 (Minn. 1998). In that case, we addressed ERISA preemption in the context of Minnesota's collateral-source statute, Minn. Stat. § 548.36 (1996), which provided that benefits paid under an ERISA-governed benefit plan constituted a collateral source. *Id.* at 573 n.1. We held that ERISA did not preempt the state law because the statute did not impose any

(Footnote continued from previous page.)
*Partnership*). "Each state designs its own UC [unemployment compensation] program within the framework of the federal requirements. The state statute sets forth the benefit structure (e.g., eligibility/disqualification provisions, benefit amount) and the state tax structure (e.g., state taxable wage base and tax rates)." *Id.*

While the Secretary of Labor approves state unemployment insurance laws to assure that they comply with federal law, *see* 26 U.S.C. §§ 3303-3304 (2012), such laws vary widely from state to state. There are "many variables in states['] taxable wage bases and rates, benefit formulas, and economic conditions . . . ." *Federal-State Partnership*, at 10. "There are no federal standards for benefits in terms of qualifying requirements, benefit amounts, or duration of regular benefits. Hence, there is no common pattern of benefit provisions comparable to that in coverage and financing. The states have developed diverse and complex formulas for determining workers' benefit rights." *Id.* at 11.

administrative or operational requirements upon ERISA plans, but merely affected plan benefits. *Id*. at 575. The same is true here. The Minnesota unemployment insurance program does not "mandate that certain features be incorporated into ERISA plans," *id.*, which is forbidden, but affects whether and when state benefits are paid to the employee. If the Minnesota program has any effect on SUB plans, such as the Plan, which has not been shown, the effect is indirect and attenuated.[7]

## IV.

I find it difficult to believe that Congress, in adopting ERISA, meant to mandate states to pay particular amounts of unemployment benefits. And I cannot agree with a judicial decision that forces the State of Minnesota's legislative and executive branches to disregard certain severance payments as the State pays benefits from, and collects taxes for, its unemployment insurance program. For all of these reasons, I respectfully dissent.

---

[7] Along the same lines, *see Hewlett-Packard Co. v. Diringer*, 42 F. Supp. 2d 1038 (D. Colo. 1999) (ERISA does not preempt state law that requires employers to include the value of ERISA-plan benefits in calculating wages for worker's compensation purposes); *Lawrence Paper Co. v. Gomez*, 897 P.2d 134 (Kan. 1995) (same); *Farrell v. Am. Heavy Lift Shipping Co.*, 805 So. 2d 336 (La. App. 2001) (ERISA does not preempt state law defining wages for unemployment compensation to include lump-sum vacation pay).